IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DAINA EASLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No.   12-cv-066-JPG-CJP |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant.[1] | ) |

## REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to District Judge J. Phil Gilbert pursuant to 28 U.S.C. § 636(b)(1)(B).

In accordance with 42 U.S.C. § 405(g), plaintiff Daina Easley seeks judicial review of the final agency decision denying her Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Ms. Easley applied for benefits in April, 2009, alleging disability beginning on June 15, 2005.   (Tr. 143).   The alleged date of onset was later amended to June 22, 2008. (Tr. 153).   The application was denied initially and on reconsideration.   After holding an evidentiary hearing, ALJ Joseph L. Heimann denied the application for benefits in a

---

[1] Carolyn W. Colvin was named Acting Commissioner of Social Security on February 14, 2013. She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

1

decision dated October 22, 2010.  (Tr. 11-19).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 2).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ's assessment of plaintiff's residual functional capacity (RFC) was erroneous because the ALJ did not account for her inability to be around other people and he did not correctly weigh the medical opinions.

2. The ALJ's credibility analysis was insufficient.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  For all intents and purposes relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).**

"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20**

**C.F.R. §§ 404.1520;** *Simila v. Astrue,* **573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan,* **977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler,* **737 F.2d 714, 715 (7th Cir. 1984).**   *See also Zurawski v. Halter,* **245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.… If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Ms. Easley is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,** *Books v. Chater,* **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater,* **55 F.3d 300, 306 (7th Cir. 1995)**).   This Court uses the Supreme Court's definition of substantial evidence, i.e.,

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, **402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Heimann followed the five-step analytical framework described above.  He determined that Ms. Easley had not been engaged in substantial gainful activity since the date of her application.  In fact, she had never worked.  A previous application for benefits had been denied as of December, 2008.  He refused her request to reopen the prior denial.

The ALJ found that plaintiff had severe impairments of anxiety disorder, bipolar disorder and social phobia.  He further determined that her impairments do not meet or equal a listed impairment.  The ALJ found that Ms. Easley had the residual functional capacity to perform work at all exertional levels, limited to no more than simple, routine tasks and no more than occasional interaction with the general public.  She had no past relevant work.  Applying the Medical-Vocational Guidelines ("Grids") (20 C.F.R. Pt.

5

404, Subpt. P, App. 2), the ALJ determined that she could do unskilled work at all exertional levels, and was, therefore, not disabled.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Report and Recommendation.   The following summary of the record is directed to the points raised by plaintiff.

### 1.   Agency Forms

Plaintiff was born in May, 1989, and was 19 years old on the amended onset date of June 22, 2008.   (Tr. 220, 153).   She had previously applied for disability benefits in 2007 and 2008. (Tr. 136, 140).

Ms. Easley had never worked. (Tr. 225).   She attended school through the eighth grade, in special education classes.   (Tr. 230).

In a Disability Report, Ms. Easley said that she was unable to work because of social anxiety disorder and general anxiety disorder.   She said that she got very anxious and passed out whenever she had to go into public places or anywhere where more than three people were present.   She said this began after she had seizures and was in a coma in 2005.   (Tr. 225).

Plaintiff's mother submitted a function report in which she said that plaintiff lived with her, and that plaintiff spent most of her time taking care of her son and watching television.   Plaintiff did some housework and simple cooking.   She was afraid of people and could not go anywhere alone.   Her memory and concentration

6

were not good. (Tr. 233-240).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on August 16, 2010. (Tr. 25).

Plaintiff testified that she did not go to high school. She was unable to get a GED because she "can't be in the room with people." (Tr. 31). She had never worked anywhere. (Tr. 32). She lived with her mother. (Tr. 37). Plaintiff's five year old son also lived with her. She had a second child, which she gave up for adoption. (Tr. 38-39). At the time of the hearing, her son had been staying with his paternal grandmother in Missouri for four months. (Tr. 58).

Plaintiff tried to kill herself by taking pills in the summer of 2008. Her mother and her mother's boyfriend were arguing and her mother was intoxicated. Plaintiff said she was "tired of it, so I was like I'm just going to kill myself." (Tr. 43). She was hospitalized for a few days, and then began seeing a psychiatrist, Dr. Baig. (Tr. 43-44).

Plaintiff testified that being around people or in small spaces or really big spaces made her nervous. She felt like she was going to faint. This began after her second child was born in 2006. (Tr. 44).

Ms. Easley had Medicaid. She did not see Dr. Baig at all in 2010. She moved away from her mother's house to live in Kewanee, Illinois, for a few months, but returned to the area about nine or twelve months before the hearing. She had not seen Dr. Baig since she had been back because she missed two appointments with the

counselor, so Community Counseling "suspended" her.  (Tr. 48-49).  She had been staying with her brother in Kewanee.  (Tr. 55).  She wound up babysitting his four kids all the time, and she felt she was being taken advantage of, so she moved back to her mother's house after four or five months.  (Tr. 64-65).

She was not on any medication for anxiety at the time of the hearing, and had not taken any since before she had moved to Kewanee.  (Tr. 49-50).  The medication helped her some, but she still had anxiety.  She was okay taking care of her son at home, but she was unable to even go to the store for food or clothes.  (Tr. 51-52).  She testified that the medicine prescribed by Dr. Baig helped her "a little bit, but not really."  (Tr. 61).  She said that, at the time of the hearing, she had not been shopping for nine months.  (Tr. 59).  She had crying spells when she thought about her daughter.  (Tr. 57).

Plaintiff missed her appointments at Community Counseling in 2010 because she was visiting her son at his grandmother's house in Missouri.  (Tr. 65).

Plaintiff said that she could not do a job where she only had to deal with one supervisor and one or two other people because she gets freaked out and paranoid around people.  (Tr. 62-63).

### 3.  Medical Treatment

Ms. Easley was taken to the emergency room at Alton Memorial Hospital on June 21, 2008, after she took an overdose of Zoloft.  She said that she did not want to die, she was just mad.  (Tr. 331).  Ms. Easley had been arguing with her mother, and her mother had been arguing with the mother's boyfriend, and Ms. Easley was "pissed off' and

8

trying to make them stop arguing.  She was on Zoloft because of increasing crying spells and anxiety.  She had no previous suicidal ideation or attempt.  (Tr. 346).  She was kept overnight, and then transferred to Gateway Regional Medical Center.  (Tr. 347).  She told a doctor at Gateway that she had taken the pills because she was angry with her mother after her mother called her a "ho" for being outside in her bikini.  (Tr. 430).  She had been previously diagnosed with generalized anxiety disorder, which was being treated by her obstetrician.  She was treated with Lexapro while hospitalized, and was discharged on June 25, 2008.  She was to follow up with the Community Counseling Center.  (Tr. 425-426).

Ms. Easley was seen by a Qualified Mental Health Professional (see, 59 Ill. Admin. Code. 132.25) at Community Counseling Center for an assessment on November 11, 2008.  The QMHP concluded that she suffered from anxiety and panic attacks, and that she should be referred for psychiatric evaluation.  (Tr. 489-490).

Psychiatrist Mirza Baig saw plaintiff for the first time on November 11, 2008. Plaintiff's chief complaints were that she got nervous and had panic attacks.  She said that she was very self-conscious because of her teeth, and the State would not pay to fix her teeth.  Another problem was that her mother and her mother's boyfriend were alcoholics.  In addition, she felt bad about having given her daughter up for adoption. Plaintiff said that she had been prescribed Lexapro when she was in the hospital , and it had helped her, but she quit taking it because she could not afford it.  On examination, she was alert and oriented, but tense, anxious and nervous.  She was not clinically

9

depressed. She had no suicidal thoughts, no delusions and no hallucinations. Her memory was poor. She showed poor insight and judgment. Dr. Baig prescribed Lexapro. (Tr. 498-499).

Gregory C. Rudolph, Ph.D., performed a consultative psychological exam on November 12, 2008. On mental status exam, he found that her mood was depressed and her affect was mildly to moderately anxious. She was oriented and her recent and remote memory was intact. She had an adequate fund of general knowledge and was able to perform calculations. She was able to use judgment and reasoning skills. He noted diagnoses of bipolar disorder, depressed type, and anxiety disorder with agoraphobia, social phobia and panic attacks. (Tr. 445-448).

Plaintiff saw Dr. Baig three more times. On each visit, Dr. Baig documented that plaintiff was doing well on Lexapro and was making good progress. On December 11, 2008, plaintiff said that she "wanted to thank" the doctor and that she "definitely" felt "much better." She had found a doctor who was going to fix her teeth for free. She said that her problem was still that her mother and boyfriend drank, but she was doing better and was not tense or nervous. (Tr. 500). On February 2, 2009, plaintiff told Dr. Baig that her mother had a drinking problem, had passed out many times and had lost her job. She was accompanied by her caseworker. On exam, plaintiff was alert and oriented, with good eye contact. Her mood was euthymic, i.e., normal. She was making good progress, with fewer panic attacks. Dr. Baig continued her on Lexapro. (Tr. 501). Plaintiff saw Dr. Baig for the last time on March 30, 2009. She said she was

"sick of this drama" so she was moving in with her brother. She said that she was "doing good" on Lexapro and she would try to find a doctor in her new town to prescribe it for her. Again, she was oriented with good eye contact and a normal mood. She was not depressed. She had no behavioral or management problems. Dr. Baig had no abnormal findings on mental status exam, and he noted that she was making good progress overall. He again prescribed Lexapro. (Tr. 502).

Community Counseling Center referred her to Bridgeway in Kewanee, Illinois, to continue her care. (Tr. 516). There is no indication that she ever followed up with Bridgeway.

The next mental health treatment record is dated March 17, 2010, almost a year later. Plaintiff was seen by a counselor at Community Counseling Center for an assessment on March 17, 2010. Plaintiff complained of anxiety, depression and panic attacks. (Tr. 543). She said that she did not talk to people and her teeth were "messed up." Her teeth had not been fixed as the "medical card would not pay for it." (Tr. 554). She was not taking any medications. (Tr. 560).

    4.    **RFC Assessments**

In December, 2008, state agency consultant John Tomassetti, Ph.D., assessed plaintiff's RFC based on a review of the records. He opined that she was moderately limited in some areas of functioning, including ability to understand, remember and carry out detailed instructions, to maintain concentration and attention for extended periods, and to interact appropriately with the general public. However, she was not

significantly limited in a number of areas, including ability to remember locations and work-like procedures, to understand, remember and carry out short and simple instructions, to work in coordination with or proximity to others, to make simple work-related decisions, to maintain socially appropriate behavior , and to sustain an ordinary routine without special supervision.   In his narrative remarks, Dr. Tomassetti said that Ms. Easley had the residual capacity to perform simple, routine tasks.   (Tr. 450-452).

A second state agency consultant, Kirk Boyenga, Ph.D., assessed plaintiff's RFC in June, 2009.   This doctor had the benefit of Dr. Baig's notes in making his assessment. Dr. Boyenga opined that she had moderate limitation in some areas, including ability to maintain attention and concentration for extended periods, to work in coordination with or proximity to others, and to interact appropriately with the general public.   However, he concluded that she had either no limitation or was not significantly limited in a number of areas, including ability to remember locations and work-like procedures, to understand, remember and carry out both detailed and short, simple instructions, to make simple work-related decisions, to sustain an ordinary routine without special supervision, and to maintain socially appropriate behavior.   In his narrative remarks, Dr. Boyenga said that plaintiff's social skills were impaired, but they were sufficient for setting with reduced interpersonal contact.   Her adaptation abilities were limited, but sufficient for routine, repetitive tasks.   He noted that Dr. Baig's records indicated that she was doing well and making good progress.   (Tr. 533-535).

Neither state agency consultant rated plaintiff as markedly limited in any area of functioning.

## Analysis

Plaintiff first attacks the ALJ's assessment of her RFC, arguing that the ALJ erred in failing to include additional limitations that were supported by the record and in weighing the medical opinions.

RFC is "the most you can still do despite your limitations." 20 C.F.R. §1545(a). In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record." *Ibid*. Obviously, the ALJ cannot be faulted for omitting alleged limitations that are not supported by the record.

In her brief, plaintiff identifies only one additional limitation that she argues should have been included in the RFC assessment: her limitations with being around other people. Notably, the only evidence she cites in support of this limitation is her own testimony. See, Doc. 25, pp. 13-14. This implicates her second point, which is that the ALJ erred in making summary and insufficient findings regarding her credibility.

Notably, the ALJ did not express his credibility findings in the boilerplate language which is often used in ALJ decisions and which has repeatedly been criticized by the Seventh Circuit. See, ***Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012), and cases cited therein.** Rather, the ALJ set forth a detailed discussion of plaintiff's credibility in light of the evidence.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.  *Powers v. Apfel*, **207 F.3d 431, 435 (7th Cir. 2000)**.   Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."  *Schmidt v. Barnhart*, **395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.**   Contrary to plaintiff's suggestion, "an ALJ's credibility findings need not specify which statements were not credible."  *Shideler v. Astrue*, **688 F.3d 306, 312 (7th Cir. 2012).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.   "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration."   *Getch v. Astrue*, **539 F.3d 473, 483 (7th Cir. 2008).**

ALJ Heimann gave specific reasons for his conclusion that plaintiff's allegations were not credible.   He pointed out that she had never worked and that she was able to perform a wide range of daily activities, including caring for her young child.   No treating doctor had placed work restrictions on her.   The objective medical evidence, including findings on mental status exams, did not substantiate her claim that she was

14

unable to do any kind of work.   She was not in any apparent mental discomfort at the hearing; the fact that she was able to appear as a witness, remember information and testify appropriately cast doubt on her claim that she was unable to function around people.   Dr. Baig's office notes indicated that plaintiff did well while she was taking Lexapro.   And, plaintiff failed to seek any mental health treatment from April, 2009, to March, 2010, suggesting that her condition was not as serious as she claimed it was. (Tr. 16).

Plaintiff argues that the ALJ erred because he did not cite to any evidence contradicting her testimony that she had not been shopping for nine months at the time of the hearing.   It is true that the ALJ did not cite to any evidence to contradict that specific statement, but that does not render his assessment erroneous.   The import of the ALJ's assessment was that Ms. Easley's testimony that she was unable to work because her mental condition made her unable to be around people for any length of time was not credible because it was contradicted by the evidence as a whole.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong."   **Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009).**   ALJ Heimann's analysis is far from patently wrong.   It is evident that he considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony.   **Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010).**

This leaves only plaintiff's argument that the ALJ erred in weighing the medical

15

opinions.  Since none of her treating doctors opined that she was limited in her ability to be around other people to a disabling degree, the argument that her treating doctors' opinions should have been given more weight is foreclosed to her.  Rather, she argues that the ALJ erred in accepting the opinion of state agency consultant John Tomassetti, Ph.D., who assessed her mental RFC.

Plaintiff argues that it was illogical for the ALJ to say that he accepted Dr. Tomassetti's opinion because it was corroborated by the opinions of other state agency consultants.  This argument overlooks the fact that the ALJ actually said that Dr. Tomassetti's opinion was supported by and consistent with the objective medical evidence and also was corroborated by the other state agency consultants, including Dr. Boyenga.  Supportability and consistency are two important factors to be considered in weighing medical opinions.  See, 20 C.F.R. §404.1527(d).  The fact that Dr. Tomassetti's opinion was supported by and consistent with the objective medical evidence provides substantial support for accepting his opinion.

Plaintiff argues that Dr. Tomassetti's opinion should have been discounted because the opinion of a state agency consultant is normally "entitled to very little, if any, weight."  Doc. 25, p. 15.  She is incorrect.  According to the agency's regulations,

> State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion

16

>evidence, except for the ultimate determination about whether you are disabled (see § 404.1512(b)(8)).

20 C.F.R. §404.1527(e)(2)(i), revised 2012; formerly 20 C.F.R. §404.1527(f)(2)(i).

Since she is unable to cite medical evidence contradicting the opinions of the state agency consultants, plaintiff is left to argue that her own testimony contradicts their opinions. However, as was discussed above, plaintiff has not demonstrated that the ALJ's credibility assessment was erroneous. Therefore, the ALJ did not err in accepting medical opinions that conflicted with her testimony. It is the function of the ALJ, and not this Court, to weigh the evidence and decide such conflicts, and this Court cannot substitute its judgment for that of the ALJ. *White v. Barnhart*, **415 F.3d 654, 659 (7th Cir. 2005).**

## Recommendation

After careful review of the record as a whole, the Court is convinced that ALJ Heimann committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the undersigned recommends that the final decision of the Commissioner of Social Security denying Daina Easley's application for SSI be **AFFIRMED** and that judgment be entered in favor of defendant.

Objections to this Report and Recommendation must be filed by **April 1, 2013**.

**Submitted:   March 14, 2013**.

>s/ Clifford J. Proud
>**CLIFFORD J. PROUD**
>**UNITED STATES MAGISTRATE JUDGE**